IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 18, 2004

## STATE OF TENNESSEE v. JEREMY SHERON HALL
## a/k/a RODNEY LEE JONES

**Appeal from the Criminal Court for Sullivan County**
**No. S46,078     Phyllis H. Miller, Judge**

———————————

**No. E2003-02946-CCA-R3-CD - Filed February 24, 2005**

———————————

Convicted by a Sullivan County Criminal Court jury of possession of .5 grams or more of cocaine with intent to sell, the defendant, Jeremy Sheron Hall, a/k/a Rodney Lee Jones, appeals and challenges the trial court's failure to suppress evidence, the admission of hearsay evidence, the imposition of a $100,000 fine, and the length of the sentence imposed. We affirm the criminal court's judgment.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

Stephen M. Wallace, District Public Defender (at trial); Leslie Hale, Assistant Public Defender (at trial); and Julie A. Rice, Knoxville, Tennessee (on appeal), for the Appellant, Jeremy Sheron Hall a/k/a Rodney Lee Jones.

Paul G. Summers, Attorney General & Reporter; Renee Turner, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Kent Chitwood, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The defendant in this case stands convicted of possession of .5 grams or more of cocaine with the intent to sell or deliver. His conviction stems from his January 21, 2002 arrest in the parking lot of the Kingsport Inn in Sullivan County. Using a confidential informant, Kingsport Police Officer Rusty Wallace, Patrolman Kevin Hyatt, Sergeant Tim Crawford, and Detective Sean Chambers organized a "buy-bust" drug operation aimed at apprehending a suspected drug trafficker known as "Scientific." The defendant's arrest netted several rocks of crack cocaine packaged in a plastic bag and concealed in the corner of the defendant's mouth, 70 individually wrapped rocks of cocaine secreted between the defendant's buttocks, and a single rock of crack cocaine found in the

console of the gold Chevrolet Malibu that the defendant was driving. The rocks tested positive for cocaine base, and their collective weight was 15.65 grams.

Pretrial, the defendant moved to suppress the drugs and a cellular telephone that also was seized from him. He claimed that the evidence was obtained as the result of an illegal stop and detention of his vehicle. The trial court conducted a suppression hearing and denied the motion. At trial, the defendant did not testify or call any witnesses, but the theory of defense, as developed through cross-examination of state witnesses, was that the state had failed to prove that the defendant intended to sell or deliver the crack cocaine. The jury was instructed to consider the charged offense and the lesser included offenses of (a) attempt to possess .5 grams or more of cocaine with intent to sell or deliver, (b) possession of less than .5 grams of cocaine with intent to sell or deliver, (c) attempt to possess less than .5 grams of cocaine with intent to sell or deliver, (d) simple possession, and (e) attempt to casually exchange a controlled substance. The jury rejected the defense theory and found the defendant guilty of possession of the greater amount of cocaine with intent to sell.

On appeal, the defendant does not assail the sufficiency of the convicting evidence. Instead, he challenges the correctness of the trial court's suppression rulings, the admission at trial of prejudicial hearsay testimony, and the $100,000 fine and 15-year sentence that were imposed. We consider each of these issues in turn.

## I. Suppression of Narcotics

As developed at the suppression hearing and at trial, *see State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998) (reviewing court is not limited to what transpired at the suppression hearing; rather, it may consider the entire record, including trial transcripts), the defendant first came to the attention of the Kingsport Police Department on November 17, 2001, when he was stopped on Wilcox Drive at approximately 3:20 a.m. by Sergeant Crawford for driving 55 miles per hour in a 45 miles-per-hour speed zone. The defendant produced a North Carolina driver's license in the name of Rodney Jones. A driver's license check uncovered nothing suspicious, but the vehicle, a gold Chevrolet Malibu, was registered to a female, Tawana Jenkins. When the defendant explained that Ms. Jenkins was his girlfriend, the officer issued the defendant a traffic citation and released the defendant.

Some time later, Sergeant Crawford received general information about drug trafficking in the Johnson City area involving people from North Carolina. One such individual had the nickname "Scientific."

On January 21, 2002, a white male approached Officer Hyatt in the parking lot of the Kingsport Justice Center. The man said that he could make a drug buy from a person named "Scientific." The man explained that he was offering to help because he wanted law enforcement assistance in securing his wife's pretrial release from jail. Officer Hyatt testified that he referred the man to the district attorney's office regarding bond, but he also told the man he was willing to listen

to his information. A hastily convened meeting, held in the library of the Justice Center and attended by the informant and Officers Wallace, Hyatt, Crawford, and Chambers, ensued.

Officer Wallace testified that as a prelude to the library meeting, he had been receiving information for some time from multiple sources, including both law enforcement officers and confidential informants, that a pair of men from North Carolina had been trafficking in narcotics in Johnson City. The men had street names, "Black" and "Scientific," and were reputed to be part of a larger violent and armed group. A patrol officer, Jim Clark, who had been hearing similar information, believed that he had previously encountered either "Black" or "Scientific" and had made a digital photograph of the individual's driver's license, which bore the individual's photograph. Officer Clark showed his photograph to Officer Wallace who then showed it to one of his confidential informants; that informant, who had heard of "Scientific" and "Black," identified the person in the photograph as "Scientific."

At the library meeting, Officer Wallace pressed the new informant for details. The informant related that he had seen "Scientific" sell drugs in the area of the Kingsport Inn, where the informant was staying. The informant also said that the dealer drove a newer model gold Chevrolet. Officer Wallace produced a photographic array and asked the informant if he recognized anyone as being "Scientific." Officer Wallace had included in the array the photograph obtained earlier from Officer Clark, and it was that photograph that the informant identified as "Scientific." The informant also ultimately admitted that he had personally purchased drugs from "Scientific" and that the dealer "would deliver the drugs to his room but he had to go outside and meet him at the car."

Based on the informant's information and his offer to participate in a controlled buy, the officers organized a "buy-bust." The plan involved going to the informant's hotel room at the Kingsport Inn and making a telephone call to set up the drug transaction. Sergeant Crawford and Hyatt accompanied the informant inside the hotel room. Because the telephone in the room was not working, Officer Wallace took the informant to a pay telephone across the street; Officer Wallace dialed the number and handed the receiver to the informant. The officer heard the informant say that "this is JT, I need an 8. Yeah, uh, uh, room 155 Kingsport Inn." When the call terminated, the informant related that "Scientific" would arrive in 10 minutes.[1] The informant returned to the motel room and stayed with Sergeant Crawford and Hyatt, while Officer Wallace and Detective Chambers remained outside in their vehicle.

Approximately 10 minutes had elapsed when Officer Wallace and Detective Chambers observed a newer model gold Chevrolet pull into the parking lot. Detective Chambers testified that as the Chevrolet passed the officers' position, he saw and could identify the driver of the vehicle as the individual known as "Scientific" whose photograph Detective Chambers had seen at the Justice Center. Detective Chambers radioed the hotel room and advised that the vehicle was headed toward the room.

---

[1] As discussed later in this opinion, the trial court did not admit at trial remarks made by the informant after the call terminated. These statements were, however, introduced at the suppression hearing.

The officers inside the room "peeked" out the window and saw the vehicle backing into a parking space in front of the room. They opened the motel door and proceeded to either side of the vehicle, with their guns drawn but not raised. According to Sergeant Crawford, standard procedure required officers to unholster their firearms when dealing with individuals believed to be selling drugs and armed. As for why the officers did not remain in the hotel room, Sergeant Crawford explained that because of safety concerns, they did not send the informant out to the vehicle to obtain the drugs, and based on the informant's information, the officers knew that the defendant would not come to the motel door.

When Sergeant Crawford reached the driver's side window, he told the driver to put the car in "park" and open the door. The defendant shifted the car into "park" but refused to unlock the door. Instead, he "immediately took his right [hand] and went in between his legs." Sergeant Crawford testified that he thought the defendant "was either going for a weapon or hiding evidence or something so I told him again, repeatedly, open the door, open the door." Again, the defendant refused to comply, and at that point, the officers raised their guns and pointed them at the defendant. Officer Hyatt, who had approached the passenger side, recalled seeing the defendant's furtive movement, and therefore pointed his gun at the defendant, screaming for the defendant to raise his hands, and hitting the car window with his arm.

Eventually, the defendant unlocked the car door. Sergeant Crawford described what happened next:

> Well, believing that he may have been hiding a weapon or putting some type of contraband or evidence underneath – stuffing it in the seat or under the seat, especially a weapon, I took him out of the car, grabbed a hold of him, and put him on the ground. And then we patted him down[,] and he was handcuffed.

No weapons were discovered. By that time, Detective Chambers and Officer Wallace had arrived at the car. One of the officers asked the defendant's name. The defendant answered, "Lee," but his response was garbled. Detective Chambers asked the defendant if he had anything in his mouth, and when the defendant opened his mouth, the officer spied a plastic bag between the defendant's cheek and gum. Detective Chambers then took a key and "raked a plastic baggie out of [the defendant's] mouth." The baggie had rocks in it that appeared to be crack cocaine. Based on that find, Officer Hyatt began to search the vehicle whereupon he found and seized another plastic baggie with a tan colored rock in it and a cellular telephone. The third and largest stash of crack cocaine was found on the defendant's person at the jail when he was strip searched.

At the police station, Officer Wallace examined the cellular telephone's log of calls received. One of the calls received corresponded to the number of the payphone where the informant set up the drug buy, and the time listed for that call corresponded to the time the informant placed the call. Officer Wallace did not ascertain the number assigned to the cellular telephone itself.

The defendant challenged the seizure of the narcotics and his cellular telephone on several grounds. He argued that the officers witnessed no traffic infraction justifying the defendant's detention on reasonable suspicion or probable cause grounds. He also claimed that the information relayed by the confidential informant did not supply probable cause to arrest the defendant or reasonable suspicion to detain him in the motel parking lot. Although implicitly agreeing that the defendant was violating no traffic laws, the trial court concluded that the officers had probable cause to arrest and search the defendant based upon the reliability of the informant's tip and the informant's basis of knowledge. Alternatively, the trial court ruled that even if probable cause was lacking, the officers had reasonable suspicion to investigate the defendant's presence in the parking lot and that the defendant's furtive gestures, as if reaching for a weapon, justified searching him for a gun.

Aggrieved by the denial of his suppression motion, the defendant urges this court to reverse and order the suppression of all evidence, as he writes on appeal, "flowing from the illegal stop of his car in the parking lot of the Kingsport Inn."

We review the trial court's findings and rulings pursuant to a familiar standard. "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Credibility questions, evaluations of the weight of the evidence, and evidentiary disagreements fall within the trial court's province as the trier of fact. *See State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000); *Odom*, 928 S.W.2d at 23. The party prevailing in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23; *see State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). The trial court's conclusions of law, however, are reviewed *de novo* without a presumption of correctness. *See State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fourth Amendment of the United States Constitution protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures and commands that "no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Tennessee Constitution similarly provides, in relevant part, that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." Tenn. Const. art. 1, § 7. These constitutional protections "are implicated only when a police officer's interaction with a citizen impermissibly intrudes upon the privacy or personal security of the citizen." *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000). Stated another way, these constitutional safeguards do not attach to law enforcement activities unless the activities qualify as a "search" or "seizure" within the meaning of the Fourth Amendment and/or Article 1, Section 7 of the Tennessee Constitution. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001).

As we view the matter, it is possible to clear two swaths through the present constitutional thicket. Traveling along the first path, we encounter the informant's tip alone and consider whether the reliability of that tip and the informant's basis of knowledge supplied probable

-5-

cause justifying the defendant's seizure and arrest. Making our way along the second path, we examine the mere reasonableness of the officers' suspicion in approaching the defendant in a public place and reacting to furtive gestures inside the automobile.

According to both the Fourth Amendment and Article I, section 7 of the Tennessee Constitution, "a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Yeargan*, 958 S.W.2d at 629 (citation omitted). One such exception to the warrant requirement arises when an arresting officer has "probable cause" to effectuate a warrantless arrest. *See State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997) (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964)); *State v. Jacumin*, 778 S.W.2d 430, 431 (Tenn. 1989). Probable cause in the context of a warrantless arrest "exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" *Bridges*, 963 S.W.2d at 491 (quoting *Beck*, 379 U.S. at 91, 85 S. Ct. at 225); *see State v. Lewis*, 36 S.W.3d 88, 97 (Tenn. Crim. App. 2000) ("Probable cause is 'a reasonable grounds for suspicion, supported by circumstances indicative of an illegal act.'").

If the arresting officers rely on information from a criminal confidential informant, they must be able to demonstrate that the informant (1) has a basis of knowledge and (2) is credible or the information is reliable. *See Jacumin*, 778 S.W.2d at 436 (adopting two-prong test of *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584 (1969)); *Lewis*, 36 S.W.3d at 98. On the other hand, "[i]nformation provided by a [known] citizen/bystander witness . . . is presumed to be reliable, and the prosecution is not required to establish either the credibility of the informant or the reliability of his information." *State v. Cauley*, 863 S.W.2d 411, 417 (Tenn. 1993); *see State v. Melson*, 638 S.W.2d 342, 354-56 (Tenn. 1982); *Lewis*, 36 S.W.3d at 98.

The defendant in this case complains that the state did not show the informant's basis of knowledge or his credibility. In light of the trial court's findings and our independent review of the application of those findings to the applicable law, we disagree.

As for the informant's basis of knowledge, he related to the investigating officers personal observations and dealings – first-hand information. The informant identified the dealer known to him as "Scientific" from a photo spread and had a telephone number to contact the dealer. The informant's identification of the man in the photograph as "Scientific" was corroborated by another informant's similar identification. The new informant knew that the drug dealer drove a newer model gold Chevrolet, and the informant had witnessed drug sales by the dealer in the Kingsport Inn area. Indeed, the informant admitted that he had personally purchased drugs from the dealer who would drive up to the informant's motel room but would wait outside in the car. This evidence clearly demonstrates the informant's basis of knowledge. *See State v. Valentine*, 911 S.W.2d 328, 330 (Tenn. 1995) (that informant knew what marijuana looked like and bought

marijuana from defendant at cited location and had seen cocaine at cited location was sufficient to satisfy "basis of knowledge" prong for determining whether probable cause supported issuance of warrant); *State v. Brown*, 898 S.W.2d 749, 752 (Tenn. Crim. App. 1994) (informant's basis of knowledge firmly established in that he claimed to have purchased drugs that same day from defendant and apparently arranged a second drug transaction).

The defendant complains that because the informant gave no time-frame reference for the drug deals the "basis of knowledge" prong was not satisfied. Clearly, however, the type of information related by the informant described a current, continuing course of illegal conduct. "Staleness must be determined on a case-by-case basis." *State v. Norris*, 47 S.W.3d 457, 470 (Tenn. Crim. App. 2000). "When the illegal activity described is ongoing, courts have generally held that the [information] does not become stale with the passage of time." *State v. Thomas*, 818 S.W.2d 350, 357 (Tenn. Crim. App. 1991). The informant did not speak to the officers about some isolated event; he spoke in terms of protracted and continuous drug dealings, particularly in the area of the Kingsport Inn.

As for the informant's credibility, it is true that the general credibility of an informant is ordinarily demonstrated by previously provided information that has proven to be reliable. *State v. Moon*, 841 S.W.2d 336, 339 (Tenn. Crim. App. 1992) ("Obviously, an informant's 'track record' of providing verified information would be relevant in inferring that the informant is a credible person."). There is no evidence of such a "track record" in this case. Nonetheless, the reliability of the information can satisfy the veracity prong of the *Aguilar-Spinelli* test.

Because of previously acquired information, the officers were able to accurately gauge the reliability of the information conveyed to them. Sergeant Crawford had performed a traffic stop in November 2001 of a gold Chevrolet driven by a man who produced a North Carolina driver's license. Later, Sergeant Crawford began hearing about drug trafficking in the Johnson City area involving people from North Carolina and about one such trafficker with the nickname "Scientific." Another officer who had been receiving similar information passed along to Sergeant Crawford a photograph of an individual believed to be either "Black" or "Scientific." One of Sergeant Crawford's known confidential informants then identified the person in the photograph as "Scientific." The person who approached Officer Hyatt in the parking lot of the Justice Center on January 21, 2002, confirmed what the officers had already been hearing, and the person even identified the same photograph as did Sergeant Crawford's confidential informant. His information, thus, satisfied the veracity prong.

Finally, we note that "independent police corroboration" can compensate for any perceived deficiencies in either prong. *Jacumin*, 778 S.W.2d at 436. Virtually all of the informant's information had been corroborated beforehand by other law enforcement and non-law-enforcement sources. Additional corroboration appeared when a person matching the photograph of "Scientific" arrived in the previously described vehicle shortly after the informant's call and when the driver backed the car into a parking space in front of the informant's room – again, just as previously described by the informant.

Probable cause, in our opinion, existed for the officers to arrest the defendant, which ultimately led to the discovery of the contraband. The drugs were not improperly admitted at trial.

In the event further review should occur in this case, we now turn to the second rationale for admitting the evidence – the trial court's alternative holding that even if probable cause was lacking, the officers had "reasonable suspicion" to investigate the defendant's presence in the parking lot and that the defendant's furtive gestures, as if reaching for a weapon, justified what followed. In determining whether reasonable suspicion exists, an important consideration is that reasonable suspicion is a less demanding standard than probable cause because reasonable suspicion can be established with information that is different in quantity or content than required to establish probable cause and because reasonable suspicion can arise from less reliable information than required to show probable cause. *See State v. Pulley*, 863 S.W.2d 29, 32 (Tenn. 1993) (citing *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416 (1990)).

We first note that calling the initial encounter a traffic stop misses the mark. According to the testimony, when Officer Hyatt and Sergeant Crawford came out of the motel room, the defendant was backing into a parking space directly in front of the room. When the officers drew up next to the vehicle, the engine was running, but evidently the vehicle had already stopped moving. It is important to remember "that even when police have no basis for suspecting that an individual has committed or is about to commit a crime, the officer may approach an individual in a public place and ask questions without implicating constitutional protections." *State v. Daniel*, 12 S.W.3d 420, 425 (Tenn. 2000). In addition, an officer may constitutionally approach an individual in a parked car in a public place, ask questions, and even seek permission for a search as along as the officer "do[es] not convey a message that compliance with [the officer's] request[] is required." *Id*. at 426; *see Pulley*, 863 S.W.2d at 30 (police may approach car parked in a public place and ask for driver identification and proof of vehicle registration, without any reasonable suspicion of illegal activity); *State v. Wilhoit*, 962 S.W.2d 482, 486 (Tenn. Crim. App. 1997). On the other hand, when an officer stops a moving vehicle or initiates a stop by a show of authority, a seizure invoking the protections of both the state and federal constitutions has occurred. *State v. Randolph*, 74 S.W.3d 330, 338 (Tenn. 2002) (defendant was "seized" when officer made a show of authority by activating the blue lights on his patrol car and instructing defendant to stop).

In this case, we discern nothing objectionable about the officers approaching the stopped vehicle. Granted, the officers testified that they had unholstered their firearms as they left the motel room and were carrying them at their sides; nevertheless, there is no evidence that the officers displayed their firearms to the defendant when they first approached the car.

The officers next initiated an investigatory detention of the defendant by instructing him to place the vehicle in park and open his door. The defendant complied with the order to place the vehicle in park; he balked, however, at the order to open his car door and made a furtive movement with his right hand. At that point, the officers displayed their weapons and pointed them at the defendant.

Considering whether the officers' actions were reasonable in connection with the investigatory detention, we note that the officers had information that the target was armed and dangerous. When a suspected offense typically involves the use of a weapon, frisks have been regarded as reasonable. Offenses falling into this category include robbery, rape, homicide, and large scale narcotics trafficking. *See State v. Mark Howard Russell*, No. E2002-02098-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Knoxville, Aug. 11, 2003); *State v. Winn*, 974 S.W.2d 700, 703 (Tenn. Crim. App. 1998). Moreover, the officers testified that they were alarmed by the defendant's furtive gestures indicating that he may have been reaching for a weapon. Such circumstances can support the reasonableness of a protective frisk. *See Winn*, 974 S.W.2d at 704 (listing various relevant circumstances, including an "otherwise inexplicable sudden movement toward a pocket or other place where a weapon could be concealed; an otherwise inexplicable failure to remove a hand from a pocket; backing away by the suspect under circumstances suggesting he was moving back to give himself time and space to draw a weapon").

Of course, in the context of this case the officers could not perform a weapons frisk while the defendant remained in the automobile. In our opinion, removing the defendant from the automobile, placing him on the ground, and conducting a protective frisk was reasonable, considering the prior information about being armed, the nature of the suspected crime, and the defendant's inexplicable sudden movement toward the car seat where a weapon could have been concealed. Officers need not jeopardize their own safety for the sake of expediting a legitimate investigation. *See Knowles v. Iowa*, 525 U.S. 113, 117, 119 S. Ct. 484, 488 (1998) (for the purpose of officer safety, both the driver and passenger may be ordered out of a vehicle in the course of a routine traffic stop); *Terry v. Ohio*, 392 U.S. 1, 23-26, 88 S. Ct. 1868, 1881-83 (1968) (limited pat-down search permissible upon a showing that such action is justified to protect the officer).

We must now examine the reasonableness of the officers' actions following the frisk. Sergeant Crawford testified, "I took him out of the car, grabbed a hold of him, and put him on the ground. And then we patted him down[,] and he was handcuffed." There is no evidence, however, in the record that the defendant was armed or that the officers discovered anything as a result of the protective frisk. In the typical situation, the protective frisk uncovers something justifying further investigation or an attendant arrest. Sergeant Crawford did not explain why he handcuffed the defendant *after* the frisk disclosed no weapons. Without more, we do not believe that the officers were justified in handcuffing the defendant, thereby effecting a full-blown arrest. *See State v. Antonio T. Seay*, No. M2002-02129-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Nashville, July 11, 2003) ("We agree that handcuffing the defendant was not justified by a reasonable suspicion to stop and question the defendant.").

That said, the discovery of the first cocaine rocks occurred when the defendant gave a garbled response after being asked his name. The garbled response prompted Detective Chambers to inquire if the defendant had anything in his mouth, at which point the defendant opened his mouth. Detective Chambers spied the plastic bag and "raked" it out of the defendant's mouth. That seizure set in motion the discovery of the other cocaine. We find it impossible to fathom that the officers in this case would not have asked the defendant his name in connection with an investigative

detention. That is, regardless whether the defendant was handcuffed or standing outside the vehicle after having been frisked, the officers undoubtedly would have undertaken to ascertain the defendant's identity, at which point the cocaine in his mouth "inevitably" would have been discovered. *See State v. Cothran*, 115 S.W.3d 513, 525 (Tenn. Crim. App. 2003), *perm. app. denied* (Tenn. 2003) (under inevitable discovery doctrine, illegally obtained evidence is admissible if the evidence would have otherwise been discovered by lawful means) (citing *Nix v. Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 2509 (1984)).

Consequently, for the foregoing reasons, we affirm the trial court's ruling that the evidence was not subject to suppression.

## II. Cellular Telephone

As a separate issue, the defendant objects to the trial court's admission of a cellular telephone based on what he claims was a failure in the chain of custody. This issue need not detain us long inasmuch as the defendant has waived consideration of this claim. We note that the record discloses some confusion as to which officer initially found the cellular telephone, but the defendant failed to object to admission of the item until after it had been introduced. Indeed, the defendant did not register an objection until after the state had rested its case. Under the circumstances, the failure to voice a contemporaneous objection waives the issue. *See, e.g., State v. Burton*, 751 S.W.2d 440, 448 (Tenn. Crim. App. 1988) (failure to make contemporaneous objection to evidence resulted in waiver of issue); *State v. Davis*, 741 S.W.2d 120, 124 (Tenn. Crim. App. 1987) (failure to object to evidence "until after it was all placed before the jury" resulted in waiver of issue); *see also* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

## III. Hearsay Statements

In his next issue, the defendant complains that the trial court erroneously admitted hearsay statements made by the informant even though it had previously ruled such statements inadmissible.

The informant did not testify in the case, and during Officer Wallace's testimony, the state sought to elicit that the informant had told the officers that he could buy drugs from a person known as "Scientific." The defense registered a hearsay objection, and following a jury-out hearing, the court ruled that the state could not admit the informant's remarks to the officers. Thereafter, the state sought to elicit what Officer Wallace heard the informant say during the telephone call to set up the drug buy and to elicit that after the call, the informant told Officer Wallace that the subject would be at the motel in ten minutes and would be driving a gold car. After another jury-out hearing, the court ruled, "[Y]ou can't say he said he'd be here in ten minutes and he'll be driving a gold car." The court also told the state that Officer Wallace could not discuss the name "Scientific."

The defendant insists that the trial court ruled that no mention could be made of the contents of the informant's portion of the telephone conversation from the pay phone; the state, according to the defendant, then deliberately led Officer Wallace back into hearsay territory regarding the informant's end of the conversation. The record shows that Officer Wallace testified, "[O]nce the number was dialed he had, I heard him say 'This is J-T, I need an eight. Yeah, uh-huh, room 115 Kingsport Inn.'" Officer Wallace did not mention the name "Scientific" or attribute to the informant the statements that the dealer would arrive in 10 minutes and be driving a gold car.

Our review of the record persuades us that the trial court never excluded as inadmissible hearsay the informant's portion of the pay telephone conversation. The defendant is simply wrong on that account. Moreover, we note that the defense registered no contemporaneous objection, hearsay or otherwise, to the allegedly offending testimony. The issue, consequently, has been waived. *See* Tenn R. Evid. 103(a)(1); Tenn. R. Crim. P. 36(a); *see also State v. Sutton*, 562 S.W.2d 820, 825 (Tenn. 1978). Further, hearsay testimony is probative unless proper objection is made to it. *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981).

Even had a proper hearsay objection been registered, in our view the informant's end of the telephone conversation is not hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801(c). We conclude that the informant's end of the conversation, as repeated by Officer Wallace, was not offered to prove the truth of the matters asserted. Faced with a similar situation in *State v. Jaman T. Booker*, No. 03C01-9607-CC-00273 (Tenn. Crim. App., Knoxville, June 24, 1997), the court ruled that the confidential informant's statements "were clearly made for the purpose of providing the defendant, a willing drug dealer, with a customer and merely depicted one side of a drug transaction." *Id*., slip op. at 4. The same holds true in this case, and the defendant is entitled to no relief on his hearsay claim.

## IV. Sentencing

### A. $100,000 Fine

Turning next to his sentencing hearing, the defendant objects to the trial court's approval of the jury-levied fine in the amount of $100,000. He complains that he has no current ability to pay such a fine and that his prospects for future employment upon release are poor. He also argues that his offense was not so egregious as to warrant such a large fine.

Appellate review clearly extends to the imposition of fines. *State v. Bryant*, 805 S.W.2d 762, 767 (Tenn. 1991). When an offense is punishable by a fine in excess of $50, it is the jury's responsibility to set a fine, if any, within the ranges provided by the legislature. *See* Tenn. Code Ann. § 40-35-301(b) (2003). The trial court, in imposing the sentence, shall then impose a fine in an amount not to exceed the fine fixed by the jury. *See id.*

The trial court's imposition of a fine is to be based upon the factors provided by the 1989 Sentencing Act, which includes the defendant's ability to pay the fine. *See State v. Marshall*, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993). A defendant's ability to pay, however, is *not* the controlling factor. *State v. Butler*, 108 S.W.3d 845, 853 (Tenn. 2003). A fine, in other words, "is not automatically precluded because it works a substantial hardship on the defendant; it may be punitive in the same fashion incarceration may be punitive." *State v. Jimmy Wayne Perkey*, No. E2002-00772-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Knoxville, Aug. 12, 2003), *perm. app. denied* (Tenn. 2003). Other relevant factors include prior history, potential for rehabilitation, and mitigating and enhancing factors that are relevant to an appropriate overall sentence. *See State v. Blevins*, 968 S.W.2d 888, 895 (Tenn. Crim. App. 1997). The seriousness of a conviction offense may also support a punitive fine. *See State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996).

We find no objection by the defendant at the time of sentencing to the fine that the jury imposed and no proof or argument why the court should not approve the fine. The amount of the fine was included as a ground in the new trial motion, but defense counsel did not argue the issue. The trial court briefly mentioned the fine in denying the motion for new trial; it noted the large amount of cocaine involved and the defendant's youth and apparent good health. On appeal, the defendant merely argues that his future prospects for employment are not good and that the value of the cocaine – as opposed to the amount – is not so egregious as to support the fine.

In our estimation, the defendant has not shouldered his burden on appeal to show why the fine is excessive. *See Butler*, 108 S.W.3d at 852. The defendant's criminal history and the seriousness of the offense adequately support the punitive nature of the fine assessed. In addition, the trial court found the defendant's credibility to be nonexistent, as illustrated by the defendant's testimony at sentencing that he possessed the 15.65 grams of crack cocaine for personal use. The court specifically found that the defendant was "untruthful, doesn't take responsibility for his actions" and that "[i]t's a totally unbelievable, incredible story he's testified to today, under oath." Given the circumstances, we find no error or abuse of discretion in the imposition of the fine in this case.

### B. 15-Year Range II Sentence

For his last issue, the defendant complains that the length of his sentence is excessive. He does not challenge the trial court's application of enhancement factors for prior criminal history and prior unwillingness to comply with release conditions. *See* Tenn. Code Ann. § 40-35-114(2), (9) (2003). Additionally, he does not advocate a particular sentence but argues in general terms that his sentence should have been "mitigated downward" because his conduct did not threaten or cause serious bodily injury.

When, as in this case, a defendant complains that he was improperly sentenced, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This

presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991); *see State v. Hooper*, 29 S.W.3d 1, 5 (Tenn. 2000). "The burden of showing that the sentence is improper is upon the appellant." *Ashby*, 823 S.W.2d at 169. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. *Id*. If appellate review, however, reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The mechanics of arriving at an appropriate sentence are spelled out in the Criminal Sentencing Reform Act of 1989. At the conclusion of the sentencing hearing, the trial court determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b) (2003); 40-35-103(5) (2003); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

In the present case, the trial judge made appropriate reference to the principles of sentencing and expressed specific findings of fact. We, therefore, accord to her judgment the presumption of correctness.

As a Range II multiple offender convicted of a Class B felony, the defendant faced a sentencing range of 12 to 20 years. *See* Tenn. Code Ann. § 40-35-112(b)(2) (2003). The defendant's 15-year sentence exceeds the presumptive minimum sentence by three years. The defendant complains that the trial court improperly overlooked, as a mitigating factor, that his conduct "neither caused nor threatened serious bodily injury," *see id*. § 40-35-113(1) (2003), and he relies upon *State v. Ross*, 49 S.W.3d 833 (Tenn. 2001), as rejecting a *per se* exclusion of this mitigating factor in drug cases. As we shall explain, we find no reason to disturb the trial court's sentencing determination.

First, we do not interpret the trial court's remarks during sentencing as adopting a *per se* exclusion of the disputed mitigating factor. The trial court explained,

> Mitigating factors, number one is criminal conduct neither caused nor threatened serious bodily injury. Jury found him guilty of possession with intent to distribute. He had a large, extremely large amount of cocaine on him, crack cocaine. I don't think that that mitigating factor would apply. But if it does, because it's a Schedule

II drug and the amount, I give it very, very little weight; a negligible amount of weight.

The trial court's ruling also does not run afoul of *Ross*. Indeed, in *Ross* the supreme court stated,

> Although cocaine itself may well be, in the words of the trial court, an "inherently addictive and dangerous substance," this fact alone says nothing about the appellant's criminal conduct, which was constructive possession of the substance located in a room several doors down from where the officers initially found the appellant. Moreover, we see no evidence in the record that the appellant actually sold or attempted to sell the drug at the time of the offense. Had either of these circumstances been present, then the dangerous nature of the drug, combined with the dangerous nature of many drug transactions, may have indeed supported the trial court's rejection of this factor as constituting a threat of serious bodily injury.

> . . . [W]e conclude that when, as here, (1) the conviction for possession is based only upon constructive possession, and (2) the threat of serious bodily injury is more conceptual than real, little justification exists in having a *per se* rule that excludes consideration of this mitigating factor. . . .

> However, in rejecting a *per se* exclusion of this mitigating factor in cocaine possession cases, we do not require that this factor be accorded any especial significance in a given case.

*Id*. at 848.

By contrast, the defendant in this case was convicted of actual, not constructive, possession of a large amount of cocaine with intent to sell or deliver. Moreover, when arrested, the defendant was in the midst of an attempted sale of cocaine. Under the circumstances, we find no error in the trial court's rejection of this mitigating factor as constituting a threat of serious bodily injury and no error in its alternative ruling assigning marginal weight to the factor, should it apply. *See State v. Michael Andrae Holman*, No. M2002-01471-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Nashville, July 23, 2003) (even if the mitigating factor that conduct neither caused nor threatened serious bodily injury applied, it was entitled to very little weight due to substantial amount of cocaine involved and proof that defendant intended to sell the cocaine).

Now, having performed our statutory *de novo* analysis of the length of the sentence, we must take into account the impact of the federal constitutional guarantee of the right to jury trial. *See* U.S. Const. amend VI.

In *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531 (2004), the United States Supreme Court held that the defendant's constitutional rights to a jury trial were violated when the trial judge, based upon facts he found without the aid of a jury, imposed a sentence in excess of the "maximum" he could have otherwise imposed under state law "without the challenged factual finding." *Id.* at ___, 124 S. Ct. at 2536-38. The "maximum" sentence for purposes of Blakely "is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Id.* at ___, 124 S. Ct. at 2537 (emphasis in original). The statutory maximum the court may impose is the maximum "he may impose *without* any additional findings." *Id.*, 124 S. Ct. at 2537 (emphasis in original). "When a judge inflicts punishment that the jury's verdict [or guilty plea] alone does not allow, [a] jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority." *Id.*, 124 S. Ct. at 2537 (citation omitted). The single exception to this rule is that state law may authorize a trial judge to increase a sentence beyond the minimum based upon "the fact of a prior conviction." *Id.* at ___, 124 S. Ct. at 2536; *see Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362 (2000).

Pursuant to *Blakely* and *Apprendi*, sentence enhancement, such as the trial court performed in this case, based upon section 40-35-114's factor (9) of prior unwillingness to comply with release conditions requires a jury finding. Accordingly, this factor should be disregarded.

The other sentencing enhancement factor in this case for prior criminal history, Tenn. Code Ann. § 40-35-114(2) (2003), survives pursuant to *Blakely* and *Apprendi*, as an exception to the requirement of a jury finding. The record in this case shows that the defendant was convicted, *inter alia*, in 1996 of two counts of felony robbery with a dangerous weapon. Evidently, these convictions were used to classify the defendant as a Range II multiple offender. *See* Tenn. Code Ann. § 40-35-106(a)(1), (b)(4) (2003). When the state filed its notice of intent to seek enhanced punishment, it listed the two robbery convictions and a 1993 conviction for misdemeanor possession of marijuana in West Virginia. Our review of the presentence report discloses that the defendant also has two convictions for criminal impersonation and a conviction for driving with a revoked license in 2002. Considering the defendant's conviction offense in this case, these prior convictions – particularly the prior drug conviction – are entitled to substantial weight, justifying the imposition of a 15-year sentence.

We, therefore, decline to disturb the ultimate sentencing decisions made by the trial court.

## V. Conclusion

In accordance with the foregoing, we hold that the trial court properly denied the defendant's suppression motion, did not permit the introduction of inadmissible hearsay, and committed no reversible error in sentencing the defendant. The judgment of the trial court is, therefore, affirmed.

_____

JAMES CURWOOD WITT, JR., JUDGE